## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JUSTIN CORLISS,

         Petitioner,

    v.

COMMONWEALTH OF
PENNSYLVANIA, *et al.*,

         Respondents.

No. 4:21-CV-01758

(Chief Judge Brann)

### MEMORANDUM OPINION

#### MAY 12, 2023

Petitioner Justin Corliss initiated this action in October 2021 by filing a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He then hired private counsel, who filed an amended Section 2254 petition several months later.  Corliss challenges his 1998 convictions for statutory sexual assault, aggravated indecent assault of a person under 16 years of age, indecent assault, and corruption of minors.  After careful consideration, the Court must dismiss Corliss's Section 2254 petition.

## I.  BACKGROUND AND PROCEDURAL HISTORY

The convictions underlying the instant petition stem from an incident that occurred in 1997, more than 25 years ago.  Corliss owned a pet store, and the

victim—D.G.—worked there.[1]  At the time of the incident, Corliss was 31 years old and was aware that D.G. was only 14.[2]  D.G. alleged that Corliss performed oral sex on her and had also had sexual intercourse with her on multiple occasions in the summer of 1997.[3]  The Commonwealth of Pennsylvania eventually charged Corliss—at criminal case number CP-45-CR-000743-1997 (hereinafter 743-1997)—with the following offenses:

- July 1, 1997: statutory sexual assault and corruption of minors;

- July 9, 1997 – Afternoon: statutory sexual assault, aggravated indecent assault, indecent assault, and corruption of minors;

- July 9, 1997 – Evening: statutory sexual assault, aggravated indecent assault, indecent assault, and corruption of minors.[4]

A jury trial was held in July 1998, after which Corliss was convicted of the four charges stemming from the evening of July 9 and acquitted of the other six charged offenses.[5]  The following month, he was sentenced to 4 to 10 years' imprisonment.[6]

Although Corliss appealed his convictions and repeatedly sought state post-conviction relief, he was ultimately unsuccessful and was released from prison in

---

[1] Doc. 2-6 at 2 (*Commonwealth v. Corliss*, No. 3482 PHL 1998, 750 A.2d 366 (Pa. Super. Ct. Nov. 30, 1999) (nonprecedential) (table)).

[2] *Id.* at 2, 3.

[3] *See id.* at 3-5.

[4] Doc. 1-14 at 5.

[5] *Id.* at 22.

[6] *Commonwealth v. Corliss*, No. 2468 EDA 2016, 2017 WL 1927902, at *1 (Pa. Super. Ct. May 9, 2017) (nonprecedential).

July 2008 after completing the full term of his sentence.[7]  Yet completion of his

sentence did not stop Corliss from attempting to collaterally attack his 1998

convictions.  For example, Corliss filed a *coram nobis* petition in state court in

2013,[8] which filing was construed as an untimely petition under Pennsylvania's

Post Conviction Relief Act (PCRA)[9] and dismissed for lack of jurisdiction.[10]

According to Corliss, following his unsuccessful direct appeal in 743-1997, he

filed a total of *five* PCRA petitions challenging his 1998 convictions before

completing his sentence, all of which were found to be meritless.[11] [12]

In 2013, Corliss was arrested again and charged with a host of new sexual

offenses including involuntary deviate sexual intercourse with a child, incest,

attempted involuntary deviate sexual intercourse, corruption of minors, aggravated

indecent assault, indecent assault, endangering the welfare of minors, and indecent

---

[7]   *Id.* (citing *Commonwealth v. Corliss*, No. 709 EDA 2014, 2014 WL 10752177, at *1 (Pa. Super. Ct. Dec. 4, 2014) (nonprecedential)).

[8]   *See Corliss*, 709 EDA 2014, 2014 WL 10752177, at *1.

[9]   42 PA. CONS. STAT. § 9541 *et seq.*

[10]  *See Corliss*, 709 EDA 2014, 2014 WL 10752177, at *1.

[11]  *See* Doc. 10 at 44.  The page numbers on Corliss's amended habeas petition vary from the electronic CM/ECF page numbers.  For ease of reference, the Court will cite to the CM/ECF pagination appearing at the top of the pages for all record citations herein.

[12]  *See also Commonwealth v. Corliss*, 750 A.2d 366 (Pa. Super. Ct. Nov. 30, 1999) (nonprecedential) (table) (denying post-conviction relief); *Commonwealth v. Corliss*, 778 A.2d 732 (Pa. Super. Ct. Apr. 20, 2001) (nonprecedential) (table) (same); *Commonwealth v. Corliss*, 841 A.2d 571 (Pa. Super. Ct. Nov. 13, 2003) (nonprecedential) (table) (same); *Commonwealth v. Corliss*, 881 A.2d 880 (Pa. Super. Ct. June 6, 2005) (nonprecedential) (table) (same); *Commonwealth v. Corliss*, 919 A.2d 969 (Pa. Super. Ct. Dec. 29, 2006) (nonprecedential) (table) (same); *Commonwealth v. Corliss*, 974 A.2d 1178 (Pa. Super. Ct. Apr. 24, 2009) (nonprecedential) (table) (same).

exposure.[13]  These charges appear at Pennsylvania criminal docket numbers CP-45-CR-0001749-2013 (hereinafter 1749-2013) and CP-45-CR-002173-2013 (hereinafter 2173-2013) and were consolidated for trial.[14]

In September 2016, a jury convicted Corliss of the aforementioned charges and he was sentenced to 30 to 60 years' imprisonment for the convictions in case number 1749-2013 and 9 to 18 years' imprisonment for the convictions in case number 2173-2013.[15]  Although it is unclear from the record, Corliss asserts that the 30- to 60-year sentence in case number 1749-2013 was enhanced by a mandatory minimum sentencing provision due to Corliss's prior 1998 convictions.[16]  Corliss's sentences were ordered to run consecutively, creating an aggregate term of 39 to 78 years' incarceration.[17]  He was also deemed a sexually violent predator, subjecting him to mandatory lifetime sexual offender registration requirements.[18]

Corliss appealed his 2016 convictions and also sought state post-conviction relief, but was ultimately unsuccessful.[19]  He then filed a Section 2254 petition in this Court seeking to overturn his 2016 convictions, which petition was denied in

---

[13]   *See Commonwealth v. Corliss*, No. 108 EDA 2017, 2017 WL 6196304, at *2 (Pa. Super. Ct. Dec. 8, 2017) (nonprecedential).

[14]   *See id.*

[15]   *Id.*

[16]   *See* Doc. 10 at 9-10, 47.

[17]   *See Corliss*, No. 108 EDA 2017, 2017 WL 6196304, at *2.

[18]   *Id.*

[19]   *See Corliss v. McGinley*, No. 1:18-cv-2192, 2020 WL 4758250, at *4 (M.D. Pa. Aug. 17, 2020) (Jones, J.) (providing procedural history).

August 2020.[20]  The United States Court of Appeals for the Third Circuit denied a

certificate of appealability in March 2021,[21] and the Supreme Court of the United

States denied his petition for a writ of *certiorari* seven months later.[22]

Corliss did not file a federal habeas petition challenging his 1998

convictions until now.  He initially filed a *pro se* Section 2254 petition in October

2021[23] then retained private counsel, who filed an amended petition in February

2022.[24]  Corliss's amended petition is extremely lengthy (spanning 85 pages), but

he only asserts a single claim: ineffective assistance of trial counsel for failure to

retain an independent DNA expert to review the state's 1998 DNA report.[25]

Corliss maintains that the "uninterpretable" results on the 1998 report were

actually interpretable and exculpatory.[26]  His amended petition is fully briefed and

ripe for disposition.

## II.   STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)[27]

mandates that petitioners demonstrate that they have "exhausted the remedies

---

[20]   *See id.*, at *1, 24.
[21]   *Corliss v. Superintendent Coal Twp. SCI*, No. 20-2778, 2021 WL 3416863, at *1 (3d Cir. Mar. 2, 2021) (nonprecedential).
[22]   *Corliss v. McGinley*, 142 S. Ct. 339 (2021) (mem.).
[23]   Doc. 1.
[24]   Doc. 10.
[25]   *See id.* at 74.
[26]   *See id.*
[27]   28 U.S.C. §§ 2241-2254.

available in the courts of the State" before seeking federal habeas relief.[28]  An

exhausted claim is one that has been "fairly presented" to the state courts "by

invoking one complete round of the State's established appellate review process,"

and which has been adjudicated on the merits.[29]

If a state prisoner has not fairly presented a claim to the state courts "but

state law clearly forecloses review, exhaustion is excused, but the doctrine of

procedural default may come into play."[30]  Generally, if a prisoner has

procedurally defaulted on a claim by failing to raise it in state-court proceedings, a

federal habeas court will not review the merits of the claim, even one that

implicates constitutional concerns.[31]

A few limited exceptions to this rule exist.  One exception is that "[a]

prisoner may obtain federal review of a defaulted claim by showing cause for the

default and prejudice from a violation of federal law."[32]  "Cause for a procedural

default exists where something *external* to the petitioner, something that cannot

fairly be attributed to him[,] . . . impeded [his] efforts to comply with the State's

procedural rule."[33]  To establish prejudice, a petitioner must show not merely that

---

[28]  *Id.* § 2254(b)(1)(A).

[29]  *Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999)); *see also Johnson v. Williams*, 568 U.S. 289, 302 (2013).

[30]  *Carpenter*, 296 F.3d at 146 (citations omitted).

[31]  *Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 747-48 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)).

[32]  *Id.* at 10 (citing *Coleman*, 501 U.S. at 750).

[33]  *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (alterations in original) (citations and internal quotation marks omitted).

there were errors that created a possibility of prejudice, but that they "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."[34]   If cause and prejudice are established, the federal court reviews the claim *de novo* "because the state court did not consider the claim on the merits."[35]

Another rare exception that will excuse a procedural default is if the petitioner can show that "failure to consider the claim will result in a fundamental 'miscarriage of justice.'"[36]   To satisfy the "fundamental miscarriage of justice" exception, a petitioner typically will have to show actual innocence.[37]

## III.   DISCUSSION

Corliss acknowledges that his Section 2254 petition is untimely and that his claim of ineffective assistance of trial counsel is procedurally defaulted.[38]   He maintains that he can garner federal review of this Sixth Amendment claim because he can show "actual innocence" under *McQuiggin v. Perkins*[39] and *Schlup v. Delo*[40] through the results of a 2017 DNA report he obtained from an independent expert.   He also contends that he can overcome the "in custody"

---

[34]   *Holland v. Horn*, 519 F.3d 107, 112 (3d Cir. 2008) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

[35]   *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 236 (3d Cir. 2017), *cert. denied sub nom. Gilmore v. Bey*, 138 S. Ct. 740 (2018) (mem.) (citation omitted).

[36]   *Carpenter*, 296 F.3d at 146 (quoting *Coleman*, 501 U.S. at 750).

[37]   *Leyva v. Williams*, 504 F.3d 357, 366 (3d Cir. 2007) (citation omitted).

[38]   *See* Doc. 10 at 54-55, 74 & n.155.

[39]   569 U.S. 383 (2013).

[40]   513 U.S. 298 (1995).

requirement for federal habeas relief based on this same showing of actual

innocence.  For the following reasons, the Court disagrees.

### A.    The March 1, 2017 DNA Report

During the investigation that preceded Corliss's 1998 trial, the Pennsylvania

State Police (PSP)—through their crime laboratory—performed forensic testing of

multiple pieces of D.G.'s clothing, including a pair of underwear that D.G. was

wearing on July 9, 1997.[41]  According to this December 16, 1997 report, "seminal

matter" was found on D.G.'s underwear.[42]

The prosecution moved to compel a blood sample from Corliss, indicating

its intention to determine whether his DNA matched that of the seminal matter

found in D.G.'s underwear.[43]  The trial court granted that motion,[44] Corliss's blood

was drawn, and DNA testing was performed.  On March 9, 1998, a PSP forensic

scientist issued a report (hereinafter "1998 DNA report") outlining the DNA test

results.[45]

The 1998 DNA report indicated that item "Q1" was the "Stained section of

[D.G.]'s underwear," and that item "Q1C" was the "Substrate control for Q1."[46]

---

[41]   *See* Doc. 2 at 2.

[42]   *See id.*

[43]   *See* Doc. 2-3 at 2, 4 (transcript of January 15, 1998 hearing on Commonwealth's motion to compel production of a blood sample for DNA comparison).

[44]   *See id.* at 11.

[45]   *See generally* Doc. 2-1.

[46]   "The substrate, or surface, on which a biological sample is deposited can affect sample collection or the quality of DNA typing results.  For example, certain substrates, such as soil and denim, commonly contain substances that inhibit DNA testing procedures. . . .  To help

DNA was isolated from Q1 and Q1C and compared to D.G.'s and Corliss's DNA profile.[47]  The report noted that the DNA specimen from D.G. "matches the DNA from Fractions F and M of specimen Q1."[48]  It also stated that "Fraction F of specimen Q1C is consistent with a mixture of DNA from more than one (1) source which was deemed uninterpretable."[49]  In layman's terms, the DNA testing results of Q1 (the stained portion of the underwear) showed DNA only from D.G.; the testing results of Q1C (the control sample of the underwear) showed DNA from more than one source but was deemed uninterpretable.

In 2017, Dr. Monte Miller reviewed, among other things, the PSP's 1997 forensic report and the 1998 DNA report and provided his own expert opinion.[50] In his March 1, 2017 report, Dr. Miller explained that no foreign DNA was found on the stained Q1 portion of the underwear, "which is common, expected, and of no probative value."[51]  Dr. Miller also expressed doubt as to whether the stained

---

provide an insight into what DNA may have been on a surface, or item of evidence (e.g., a t-shirt) prior to the deposit of the stain of interest, a substrate sample (substrate control) may be sampled as a typing control. A visually unstained area near the stain of interest is sampled. During the DNA typing process, this sample is treated in the same manner as the stain.  The idea is to produce a representation of what level of background DNA, if any, was present on the substrate.  This information may aid in interpreting DNA mixtures."  CHIN, JUSTICE MING W. ET AL., FORENSIC DNA EVIDENCE: SCIENCE AND THE LAW § 3:1 (May 2022).

[47]   Doc. 2-1 at 3.
[48]   *Id.*
[49]   *Id.*
[50]   *See generally* Doc. 2-2.
[51]   *Id.* at 3.  Specifically, Dr. Miller explained that "[i]n cases where a significant percentage of the total DNA originated from a single person, such as this case, it is common to see this individual's DNA in tubes enriched for sperm and tubes enriched for non-sperm sources, which is what is seen here.  In both the tube enriched for sperm DNA and in the tube enriched for

portion of the underwear was actually a semen stain, noting that it could represent "a false positive if sperm were not verified by microscope" and that there was no verification that "this is, in fact, a fresh semen stain or semen at all."[52]

The report goes on to explain that DNA foreign to D.G. was detected on the control sample (Q1C) "away from the [purported] semen stain."[53]  Specifically, two alleles foreign to D.G. (that is, not present in her DNA) were detected in Q1C and, notably, Corliss "does not possess both of those alleles" and therefore could be excluded as the contributor of the foreign DNA from Q1C.[54]  Essentially, Dr. Miller disputed the 1998 DNA report's conclusion that the DNA testing results of Q1C were "uninterpretable" or inconclusive, and instead opined that the presence of the two alleles that Corliss did not possess categorically excludes him as the foreign DNA contributor for Q1C.[55]  Thus, Dr. Miller concluded, no DNA—either in the stained section or the control section of the underwear—came from Corliss.[56]

### B.    Gateway Actual Innocence Claim

Corliss hinges his actual innocence argument on Dr. Miller's 2017 report. He contends that this report, if presented at trial, would have further discredited

---

non-sperm DNA[,] there is only the DNA of [D.G.], which is common, expected, and of no probative value."  *Id.*

[52]  *Id.* at 4, 5.

[53]  *Id.* at 4.

[54]  *Id.*

[55]  *Id.* at 4-5.

[56]  *Id.* at 5.

D.G.'s testimony and convinced the jury to acquit him of the July 9, 1997 evening charges.[57]  Specifically, he argues that if the jury would have heard that the non-seminal foreign DNA on the underwear could not have been contributed by him, it would have undercut D.G.'s narrative that Corliss "grabbed and removed" her underwear on both of the July 9, 1997 sexual encounters.[58]

The Supreme Court of the United States has recognized that a credible showing of actual innocence may provide a gateway for a petitioner to pursue the merits of a Section 2254 petition despite expiration of the AEDPA's statute of limitations or procedural default of a claim.[59]  Such actual-innocence claims, however, are "demanding"[60] and "rarely successful."[61]  Circumvention of the limitations period or excusal of procedural default is only possible when a petitioner can show "new reliable evidence" of actual innocence and that, in light of this new evidence, "no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt."[62]  This standard "does not require absolute certainty of guilt or innocence, but it is demanding and will be satisfied only in rare and extraordinary cases where the evidence of innocence is so strong

---

[57]   *See* Doc. 10 at 60-61.
[58]   *See id.* at 61, 69-70, 84.
[59]   *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (citing *Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006)).
[60]   *House*, 547 U.S. at 538.
[61]   *Schlup*, 513 U.S. at 324.
[62]   *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 59 (3d Cir. 2020) (quoting *Satterfield v. Dist. Attorney of Phila.*, 872 F.3d 152, 163 (3d Cir. 2017) (quoting *McQuiggin*, 569 U.S. at 386)).

that it undermines confidence in the trial's outcome."[63]

Corliss cannot meet this stringent standard. First, a critical consideration in the analysis of a *McQuiggin* or *Schlup* actual-innocence claim is whether the petitioner was diligent in presenting his claim. As the United States Supreme Court has admonished, "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing [of innocence]."[64]

Corliss maintains that ever since he received the results of the 1998 DNA report prior to his first trial, he has wanted to obtain review by an independent expert.[65] Yet Corliss did not do so until 2017, nearly two decades later and long after he had completed his sentence for the 1998 convictions. Corliss does not adequately explain why it took him 19 years to obtain independent review of the Commonwealth's DNA report—a report which he had in his possession since the late 1990s and allegedly wanted to challenge that entire time.

The Court will assume for the sake of argument that Corliss's explanation of prohibitive indigency during his initial prosecution and incarceration is true and

---

[63] *Wallace v. Mahanoy*, 2 F.4th 133, 151 (3d Cir. 2021).

[64] *McQuiggin*, 569 U.S. at 399; *see also Schlup*, 513 U.S. at 332 (explaining that a court "may consider how the timing of the submission" bears on the reliability of evidence); *Howell*, 978 F.3d at 60 (citing *Reeves v. Fayette SCI*, 897 F.3d 154, 161 (3d Cir. 2018)).

[65] *See* Doc. 21 at 7 (noting that Corliss testified during PCRA proceedings that he had informed his trial counsel that he believed it was in his best interest to retain an independent DNA expert to review the March 9, 1998 DNA report).

excuses his delay during that time.[66]  However, it does not explain why—if Corliss believed that independent review of the state's DNA report would provide exculpatory evidence and undermine his 1998 convictions—he waited almost *four years* after his 2013 indictment to hire Dr. Miller.  Corliss was clearly not indigent in 2013 when he was charged with the new sexual assault offenses, as he retained a private attorney, Robert Saurman, Esquire, for his defense.[67]  After firing Attorney Saurman and proceeding *pro se* for some time, Corliss then hired another private attorney in February 2016 before the start of trial.[68]  That Corliss hired private counsel in 2013 and again in February 2016 directly contradicts his assertion that it was not until 2017 that he "finally had monies to retain Dr. Miller" to review the 1998 DNA report.[69]  Moreover, Corliss concedes that, as soon as the 2013 charges were filed, he "knew the Commonwealth would weaponize his convictions [and] sentences in Case No. 743-1997 against him," so he immediately began renewing his collateral attacks on the 1998 convictions by filing multiple *coram nobis* petitions.[70]

The failure to timely hire an independent expert is just one aspect of Corliss's lack of diligence.  The Court additionally notes that Corliss did not raise

---

[66]  *See* Doc. 10 at 57.
[67]  *See Commonwealth v. Corliss*, No. 108 EDA 2017, 2017 WL 6196304, at *2 (Pa. Super. Ct. Dec. 8, 2017) (nonprecedential).
[68]  *See id.*; Doc. 10 at 59 n.130.
[69]  *See* Doc. 10 at 59.
[70]  *Id.* at 58, 59; Doc. 21 at 11.

the instant claim of ineffective assistance of trial counsel until February 2022, almost five years after he received Dr. Miller's report.  Yet, as noted above, Corliss did attempt to collaterally attack his 1998 convictions in state court, filing at least one *coram nobis* petition in 2020 based on this 2017 report.[71]  He simply never asserted an argument in state court of ineffective assistance of trial counsel for failure to obtain an independent DNA expert.

Corliss proffers no persuasive excuse for this omission.  He primarily argues that PCRA relief was unavailable to him under firmly established Pennsylvania law because he had completed the full 10-year sentence for his 1998 convictions.[72]  Assuming Corliss is correct, and further assuming that Pennsylvania does not provide an exception when the at-issue conviction is used to enhance a new sentence, this argument does not explain why Corliss continued to pursue state post-conviction relief on different constitutional grounds or why he waited *five years* to bring his ineffective-assistance claim to federal court.[73]  This type of

---

[71]   *See generally* Doc. 2-9; Doc. 2-11; *Commonwealth v. Corliss*, No. 1232 EDA 2020, 2021 WL 1716246 (Pa. Super. Ct. Apr. 30, 2021) (nonprecedential).

[72]   *See* Doc. 21 at 16-17 (citing, *inter alia*, *Commonwealth v. Williams*, 977 A.2d 1174, 1176 (Pa. Super. Ct. 2009)).

[73]   It is possible that Corliss made a calculated decision to assert a gateway *McQuiggin/Schlup* actual innocence claim in an attempt to garner a more favorable standard of review (that is, *de novo*) for the underlying ineffective-assistance-of-trial-counsel claim.  Otherwise, this Court would be bound to apply a high level of deference to any habeas claim that Corliss properly exhausted in state court.  *See Harrington v. Richter*, 562 U.S. 86, 101-03 (2011).  It is equally possible that Corliss's attorney in the instant case is the first person to frame the 2017 DNA report as the key to establishing ineffective assistance of trial counsel.  In either scenario, there is a glaring lack of diligence on Corliss's part to present this particular claim.

unexcused delay cuts sharply against a showing of actual innocence.[74]

A second and more fundamental problem than Corliss's lack of diligence is the "new evidence" itself. Corliss repeatedly claims that the 2017 DNA report "exonerates" him,[75] but he is incorrect. Dr. Miller concluded that Corliss could be excluded as a donor of the DNA found on D.G.'s underwear at Q1 and Q1C. But that does not exonerate Corliss. D.G. testified at trial that Corliss did not ejaculate inside her during their sexual encounters on July 9, 1997, but rather that he ejaculated into his own clothing.[76] Dr. Miller's report also does nothing to undermine the trial testimony of G.V., who averred that she was an eyewitness to the July 9, 1997 evening sexual encounter.[77]

There was additional inculpatory evidence presented at trial, including that D.G. "was able to describe a birthmark [located] on [Corliss]'s penis,"[78] a card Corliss gave to D.G. that implied sexual intimacy and indicated "that his relationship with [D.G. wa]s important to him,"[79] and testimony from G.V. that Corliss and D.G. would frequently kiss, hug, and touch each other in the pet store.[80] The absence of Corliss's DNA on D.G.'s underwear does not undermine

---

[74]   *See Schlup*, 513 U.S. at 332; *Reeves*, 897 F.3d at 161; *cf. Howell*, 978 F.3d at 60 (emphasizing that petitioner presented affidavits supporting actual innocence claim "to state courts in PCRA petitions shortly after obtaining them").

[75]   *See, e.g.*, Doc. 2-8 at 4 (transcript of Jan. 23, 2020 hearing); Doc. 2-9 at 11.

[76]   *See Corliss*, No. 1232 EDA 2020, 2021 WL 1716246, at *3.

[77]   *See* Doc. 2-6 at 4, 6.

[78]   *Id.* at 5.

[79]   *Id.* at 5-6.

[80]   *Id.* at 6.

or diminish this other evidence of guilt.  Additionally, the 2017 DNA report calls

into question whether the stained portion of D.G.'s underwear (Q1) was semen,

noting that it could represent a false positive.  In this respect, the 2017 report

actually undermines Corliss's claims in state court and in his initial habeas

petition[81] that D.G. had sex with someone else, not him.

Corliss argues that the 2017 DNA report, if submitted at his 1998 trial,

would have been "the straw that broke the camel's back" as to D.G.'s credibility.[82]

He claims that if, as D.G. testified, he had removed D.G.'s underwear twice on

July 9, 1997, it follows that there should have been "non-seminal" DNA from his

"skin cells" on the underwear, but none was found.[83]  And this fact, Corliss asserts,

would have caused the jury to disbelieve D.G. and G.V. entirely.[84]

The Court initially observes that Corliss has provided absolutely no

support—scientific or otherwise—for his claim regarding the likelihood of DNA

from "skin cells" transferring onto D.G.'s underwear during removal thereof, or for

his bald contention that layperson jurors would have "expected this transfer of

---

[81]  *See* Doc. 1 at 4-5.  It must be noted that Corliss drastically misinterprets the findings of Dr.
Miller's report in his initial Section 2254 petition.  Corliss erroneously claims that, because the
testing results of Q1 showed only D.G.'s DNA, those results "suggest[ed] paternal rape as she
had no brothers."  *Id.*  Dr. Miller's report makes no such suggestion, instead explaining that
the results indicated that "a significant percentage of the total DNA originated from a single
person"—D.G.—and was "common, expected, and of no probative value."  Doc. 2-2 at 3.
[82]  Doc. 10 at 61.
[83]  *Id.* at 70, 84.
[84]  *Id.*

evidence."[85]  Moreover, the PSP forensic scientist only tested the stained portion of the underwear and one control section, so there is no guarantee that the control section would be where Corliss "touched" or "grabbed" D.G.'s underwear.[86]

Finally, and most importantly, the Court does not agree that if the jury considered the 2017 report, "no juror, acting reasonably, would have voted to find [Corliss] guilty beyond a reasonable doubt."[87]  Simply put, for all the foregoing reasons, the 2017 report is not the type of new evidence that would meet the demanding and "rarely successful" evidentiary burden required under *McQuiggin* and *Schlup*.[88]  That is especially true when Corliss's lack of diligence is factored into the analysis of the reliability of the new evidence.

This is not a case, like in *House v. Bell*, where "new scientific blood and semen evidence removed the alleged sexual motive presented to the jury at trial and suggested that the defendant was not even at the scene of the murder, just as the defense argued at trial."[89]  Nor is it like *Schlup v. Delo*, where the petitioner's new evidence included "sworn statements of eyewitnesses" averring that "Schlup was not involved in the crime."[90]  Corliss's new evidence, on the contrary, does not

---

[85]  *See id.*

[86]  *See id.*

[87]  *Howell*, 978 F.3d at 59 (quoting *Satterfield*, 872 F.3d at 163 (quoting *McQuiggin*, 569 U.S. at 386)).

[88]  The Court reaches the same conclusion even if the PCRA testimony of Rhiannon German, *see* Doc. 10 at 61, is included in the calculus.

[89]  *Goldblum v. Klem*, 510 F.3d 204, 233 (3d Cir. 2007) (summarizing new evidence in *House v. Bell*).

[90]  *Schlup*, 513 U.S. at 331.

17

"undermine" the Commonwealth's evidence against him,[91] and a reasonable juror presented with the results of the 2017 DNA report could still find Corliss guilty of the July 9, 1997 evening offenses.

In sum, Corliss has not made the requisite showing to establish actual innocence under *McQuiggin* and *Schlup*. This Court, therefore, cannot consider his time-barred and procedurally defaulted claim of ineffective assistance of trial counsel and must dismiss his amended Section 2254 petition for lack of jurisdiction.

### C.     "In-Custody" Requirement

Last, but certainly not least, is the "in-custody" requirement of 28 U.S.C. § 2254(a). It is well settled that a Section 2254 petitioner must establish that he is "in custody pursuant to the judgment of a State court" to seek habeas relief.[92]

Corliss concedes that he served his entire 10-year sentence in 743-1997 and cannot satisfy the general "in-custody" requirement for habeas relief as to that sentence.[93] He instead attempts to rely on *Lackawanna County District Attorney v. Coss* for the following proposition, as crafted in his own words:

> a defendant may challenge the legality of an expired judgment/conviction, where the defendant is no longer "in custody" in connection with said judgment/conviction, if the defendant obtained compelling evidence establishing he's actually innocent of the crimes for which he was convicted, and the defendant couldn't have obtained

---

[91]   *Goldblum*, 510 F.3d at 233.

[92]   28 U.S.C. § 2254(a); *Lackawanna Cnty. Dist. Attorney v. Coss*, 532 U.S. 394, 401 (2001).

[93]   *See* Doc. 10 at 55.

said evidence in a timely manner due to unconstitutional state action, such as government interference (*Brady* violation), trial counsel's ineffectiveness (*Strickland* violation), or his indigency.[94]

The problem with Corliss's argument is that *Coss* does not contain such a holding.  In *Coss*, the United States Supreme Court held that if a state "conviction [that is no longer open to collateral attack] is later used to enhance a criminal sentence, the defendant generally *may not* challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained."[95]  The Court then established a rare exception to this rule, holding that a Section 2254 petitioner could challenge an enhanced state sentence "on the basis that the prior conviction used to enhance the sentence was obtained where there was a failure to appoint counsel in violation of the Sixth Amendment, as set forth in *Gideon v. Wainwright*."[96]

Finally, the *Coss* court—in closing *dictum*—assumed without deciding that there may be other situations where a Section 2254 petitioner might be able to bring a constitutional challenge to a state conviction used to enhance a sentence if a state court "without justification, refuse[d] to rule on a constitutional claim that has been properly presented to it,"[97] or where "after the time for direct or collateral review has expired, a defendant may obtain compelling evidence that he is actually

---

[94]  *Id.*
[95]  *Coss*, 532 U.S. at 404 (emphasis supplied).
[96]  *Id.*
[97]  *Id.* at 405 (citing 28 U.S.C. § 2244(d)(1)(B)).

innocent of the crime for which he was convicted, and which he could not have uncovered in a timely manner."[98]

First, the *Coss* decision says nothing about trial-counsel ineffectiveness, a *Strickland v. Washington* claim, or a petitioner's indigency.  Second, even under the *dicta* in *Coss*, Corliss cannot contend that he properly presented his constitutional claim to the state court and the court refused to rule on it.  Third, Corliss is not asserting a *Brady v. Maryland* claim or filing a second or successive Section 2254 petition.  Fourth, if Corliss is attempting to rely on the final exception mentioned in the *Coss dicta*, he has not proffered "compelling evidence that he is actually innocent of the crime for which he was convicted" or that he could not have uncovered this evidence in a timely manner, as this Court has fully explained in Section III(B) above.  Consequently, Corliss has failed to establish that he is "in custody pursuant to the judgment of a State court" which he is attempting to challenge or that an exception to the in-custody requirement exists for his Section 2254 petition.

## IV.   CONCLUSION

For all the foregoing reasons, the Court must dismiss Corliss's petition for a writ of habeas corpus under 28 U.S.C. § 2254.  The Court likewise declines to issue a certificate of appealability, as Corliss has failed to make a substantial

---

[98]   *Id.* (citing *Brady v. Maryland*, 373 U.S. 83 (1963); 28 U.S.C. § 2244(b)(2)(B)).

showing of the denial of a constitutional right,[99] or that "jurists of reason would

find it debatable" whether this Court's procedural ruling is correct.[100]  An

appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[99]   28 U.S.C. § 2253(c)(2).
[100]   _Slack v. McDaniel_, 529 U.S. 473, 484 (2000).